Michael Delikat
James H. McQuade
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, NY  10103
Telephone:  (212) 506-5000

Attorneys for Wyeth Pharmaceuticals, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEWTON PAUL<br><br>       Plaintiff,<br><br>  v.<br><br>WYETH PHARMACEUTICALS, INC.,<br><br>       Defendant. | 07-CV-950 (CLB)(GAY)<br><br>**DEFENDANT'S RULE 56.1<br>STATEMENT** |

Defendant Wyeth Pharmaceuticals, Inc. ("Wyeth"), by its attorneys, Orrick, Herrington & Sutcliffe LLP, as and for its statement of material facts as to which there is no genuine issue to be tried, states as follows:

**Wyeth: Background and Human Resources**

   1.  Wyeth is a company engaged in the development and manufacture of pharmaceutical, consumer healthcare, and animal health products.  Declaration of Joanne Rose ("Rose Decl."), ¶ 2.  Wyeth operates pharmaceutical manufacturing facilities in numerous locations, including Pearl River, New York.  Rose Decl., ¶ 2.

   2.  During the years Plaintiff Newtown Paul was employed at Wyeth's Pearl River facility, exempt employees such as Paul generally received an annual performance evaluation that provided comments, ratings in a number of separate categories, and an overall numerical performance rating.  Rose Decl., ¶ 3.  These annual performance ratings typically were completed by an employee's direct supervisor.  Rose Decl., ¶ 3.  During the years Paul was

employed by Wyeth, Wyeth's performance rating system was based on a scale of "1" to "5," with "1" meaning "unsatisfactory," "2" meaning "below expectations," "3" meaning "solid performer," "4" meaning "exceeds expectations," and "5" meaning "outstanding." Rose Decl., ¶ 3.

3.       When an exempt employee is hired to work at Wyeth, the employee's starting salary is determined based on a number of factors, including, among others, the nature of the position the person is filling, the individual's background, experience, and skills, and the general current market rate for salaries for such positions. Rose Decl., ¶ 4. Once an employee is hired by Wyeth, he may be eligible to receive salary increases as a result of promotions, annual merit increases, or market rate adjustments. Rose Decl., ¶ 4. The overall budgets for such salary increases typically vary from year to year. Rose Decl., ¶ 4.

4.       Wyeth typically provides merit-based salary increases to its eligible exempt employees on an annual basis in the beginning of the calendar year. Rose Decl., ¶ 5. As part of this salary increase process, Wyeth approves an overall merit increase budget for all exempt eligible employees for that year. Rose Decl., ¶ 5. This merit increase budget is provided to division managers as a percentage increase in salary and is a pool amount that cannot be exceeded. Rose Decl., ¶ 5. Based on the overall merit increase budget, division managers, in conjunction with Human Resources Department representatives, determine the percentage salary increase for each individual employee in their division. Rose Decl., ¶ 5. In determining the annual percentage salary increase, key considerations are an employee's recent performance rating, contributions, and current salary range. Rose Decl., ¶ 5. Managers also consider merit salary increase guidelines, including suggested percentage salary increases for each level performance rating of 1 through 5. Rose Decl., ¶ 5. Managers typically work with representatives of the Human Resources Department in determining the merit salary increases for

individual employees, and all salary increases must be reviewed and approved by Wyeth's Human Resources Department. Rose Decl., ¶ 5.

5.      Wyeth also places certain constraints on the percentage salary increases permitted in connection with promotions, and this maximum amount may change from year to year. Rose Decl., ¶ 6.

**Paul's Background**

6.      Paul was born on May 24, 1974.  Declaration of James H. McQuade ("McQuade Decl."), Ex. 1, at Ex. 2.  In 1997, Paul received an Associate's Degree and a Bachelor's Degree in Business Administration from the State University of New York. McQuade Decl. Ex. 1, at 17-18 & Ex. 1.

7.      In 1999, Paul received a Master's Degree in Human Services and Counseling from the State University of New York.  McQuade Decl. Ex. 1, at 17-18 & Ex. 1.

8.      From 1992 through 1999, Paul was a full-time student, and during those years, he held several part-time, student positions for the State University of New York and one summer position as a sales assistant at a sporting goods store.  McQuade Decl. Ex. 1, at 18-23 & Ex. 1.

9.      From August 1998 until May 1999, Paul worked at the State University of New York as a Resident Hall Director and was paid an annual salary of $15,000 to $20,000. McQuade Decl. Ex. 1, at 23-24 & Ex. 1.

**Paul's Production Supervisor Position: August 2000 – January 2002**

10.      In August 2000, Paul was hired as a Production Supervisor working on the second shift (3:00 to 11:00 pm) in the Consumer Health Products Division at Wyeth's Pearl River facility.  McQuade Decl. Ex. 1, at 32-33 & Ex. 2.  As a Production Supervisor, Paul was responsible for supervising the pharmaceutical operators who were involved in the production

process, and he reported directly to Robert Bracco, a Department Head in Consumer Health. McQuade Decl. Ex. 1, at 34-36.

11.    Paul applied to, and was hired for this position by, Bracco.  McQuade Decl., Ex. 1, at 27-28, 31.  During Paul's tenure at Wyeth, Bracco gave Paul advice about his career, and Paul viewed Bracco as being supportive of his career.  McQuade Decl. Ex. 1, at 49-51.

12.    Paul's starting salary was set at $44,100 and his labor grade was set at "6." McQuade Decl. Ex. 1, at 33-34, Ex. 2.  Paul believed that this was a good starting salary, and he does not believe that the assignment of his starting salary was in any way discriminatory based on his race.  McQuade Decl. Ex. 1, at 35, 54.

13.    Bracco gave Paul an overall rating of "3" or "solid performer" on his annual performance review for 2000.  McQuade Decl. Ex. 1, at 38-40 & Ex. 3.  Paul was satisfied with his performance review, and he does not believe that he had been discriminated against in any way based on his race with respect to this performance review.  McQuade Decl. Ex. 1, at 38-40, 54.

14.    In January 2001, after working at Wyeth for less than six months, Paul received a 3 percent increase in his annual salary to $45,460.  McQuade Decl. Ex. 1, at 37 & Ex. 2.  Paul was satisfied with this salary increase, and he does not believe that he had been discriminated against based on his race with respect to his 2001 salary increase.  McQuade Decl. Ex. 1, at 41-42, 54.

15.    Bracco gave Paul an overall rating of "3" or "solid performer" on his annual performance review for 2001.  McQuade Decl., Ex. 5.  Paul was satisfied with his performance review, and he does not believe that he had been discriminated against in any way based on his race with respect to this performance review.  McQuade Decl. Ex. 1, at 41-42, 54.

16.     In January 2002, Paul received a 3 percent increase in his annual salary to $46,824. McQuade Decl., Ex. 1, at 38-39 & Ex. 2. Paul does not believe that he had been discriminated against based on his race with respect to his 2001 salary increase. McQuade Decl. Ex. 1, at 41-42, 54.

17.     Paul continued to report directly to Bracco until February 2002, when he was promoted to the position of Compliance Coordinator in the Consumer Healthcare Division. McQuade Decl. Ex. 1, at 52-54, & Ex. 2.

18.     Paul admits that he does not believe that he had been discriminated against in any way based on his race during the time period from the start of his employment until he assumed the Compliance Coordinator position in February 2002. McQuade Decl. Ex. 1, at 54.

**Paul's Compliance Coordinator Position: February 2002 – May 2003**

19.     In February 2002, Paul was promoted to the position of Compliance Coordinator in the Consumer Healthcare Division, where he was responsible for, among other things, participating in investigations and resolving compliance issues. McQuade Decl. Ex. 1, at 52-54, 56 & Ex. 2. Bracco helped Paul get promoted to this position. McQuade Decl. Ex. 1, at 50-51. Paul viewed his promotion to the Compliance Coordinator position as a positive event in his career and as a professional growth opportunity. McQuade Decl. Ex. 1, at 43-44.

20.     Beginning in February 2002, as a Compliance Coordinator, Paul reported directly to Ingrid Gibson, who was then a Manager of Investigations. McQuade Decl. Ex. 1, at 53. At that time, Gibson reported to Andrew Schaschl. McQuade Decl. Ex. 1, at 53.

21.     Gibson's race is black and she is of Jamaican ancestry. McQuade Decl. Ex. 1, at 68:

22.     In connection with this promotion, Paul's salary grade level was increased from "6" to "8," and he received a 10 percent increase in his annual salary to $51,506. McQuade

Decl. Ex. 1, at 54-55 & Ex. 2. A 10 percent salary increase was the maximum amount an employee such as Paul could have received in connection with this promotion at this time. Rose Decl., ¶ 6.

23.    Gibson gave Paul an overall rating of "4" or "exceeds expectations" on his annual performance review for 2002, and Schaschl approved this review as the next level manager. McQuade Decl., Ex. 7. Paul does not believe that he had been discriminated against in any way based on his race with respect to this performance review. McQuade Decl. Ex. 1, at 54.

24.    In late 2002, Paul claims he told Gibson that he felt that Derek Burt and Christopher DeFeciani were paid more than he was because of his race. McQuade Decl. Ex. 1, at 60-64. Gibson denies that Paul referred to his race in connection with his pay. Declaration of Ingrid Gibson ("Gibson Decl."), ¶ 3. Paul understood that he had the right to make a formal complaint of race discrimination, but he did not make such a complaint; he did not ask Gibson to make such a complaint; and he did not expect her to make any such complaint. McQuade Decl. Ex. 1, at 64-65.

25.    At the time Paul raised this issue with Gibson (and when he testified at his deposition), Paul knew nothing about DeFeciani or Burt's actual salary history, educational background, or prior work experience. McQuade Decl., Ex. 1, at 68-70. Nor did he know who determined salaries for himself, DeFeciani, or Burt. McQuade Decl., Ex. 1, at 70.

26.    Schaschl had intended to give Paul a salary increase in connection with the annual salary increases that typically take effect in January 2003. Declaration of Andrew ("Schaschl Decl."), ¶ 3. Wyeth did not authorize its annual merit salary increases to take effect in January 2003, as it typically does, but instead delayed the salary increases until July 2003. Schaschl Decl., ¶¶ 3, 5. However, Schaschl approved a promotion for Paul in April 2003 to the

position of Senior Compliance Coordinator and provided him with a corresponding salary increase. Schaschl Decl., ¶ 4; McQuade Decl. Ex. 1, at 55-56, 81 & Ex. 2.

**Paul's Comparators: Derek Burt and Christopher DeFeciani**

27.    Paul admits that the only Compliance Coordinators that he believes were paid more than he was based on his race were DeFeciani and Burt, and these individuals are Paul's only alleged comparators for his unequal pay claim based on the time he was a Compliance Coordinator (February 1, 2002 through April 30, 2003). McQuade Decl. Ex. 1, at 71.

28.    During the time period February 1, 2002 through May 1, 2003, Wyeth did not grant across-the-board merit-based salary increases to its exempt employees. Rose Decl., ¶ 8. Thus, Paul, DeFeciani, and Burt each received no salary increase during this time period. Rose Decl., ¶ 8.

**Derek Burt**

29.    When Burt was hired by Wyeth as a Packaging Supervisor in November 1999, he had over eight years of directly relevant job experience working as a packaging mechanic in the pharmaceutical manufacturing industry for Novartis Pharmaceuticals and, in addition, had three years of work experience in other industries. Rose Decl., ¶ 10, Ex. 2. He also had attended Motherwell College for four years, where he studied mechanical engineering. Rose Decl., ¶ 10, Ex. 2. Based on Burt's job experience and background and based on the position he was hired for, Burt's starting salary was set at $54,900. Rose Decl., ¶ 10, Ex. 1.

30.    Burt received an overall rating of "5" or "outstanding" on his annual performance review for 2000/2001, and 2002, and an overall rating of "4" or "exceeds expectations" for 2003. Rose Decl., ¶ 11, Exs. 3, 4 & 5. The 2000/2001 review and the 2003

reviews were prepared by Howard Mackey, and the 2002 review was prepared by Ingrid Gibson. Rose Decl., ¶ 11, Exs. 3, 4 & 5.

31.    In October 2000, Burt was promoted to the position of GMP Compliance Specialist and received a corresponding salary increase of 7 percent to $58,743. Rose Decl., ¶ 12, Ex. 1. In contrast, when Paul received his promotion in 2002 to the Compliance Coordinator position, he received a 10 percent salary increase. McQuade Decl., Ex. 2.

32.    In January 2001, Burt received a salary increase of 4.4 percent to $61,351. Rose Decl., ¶ 12, Ex. 1. Burt was a GMP Compliance Specialist during a completely different time period than when Paul was a Compliance Coordinator or Senior Compliance Coordinator. McQuade Decl. Ex. 1, at Ex. 2; Rose Decl., ¶ 12, Ex. 1.

33.    In December 2001, Burt was promoted to the position of Senior Compliance Coordinator and received a corresponding salary increase of 7 percent to $65,646. Rose Decl., ¶ 13, Ex. 1. This is the same percentage increase in salary that Paul received when he was promoted to the Compliance Coordinator position in February 2002. McQuade Decl. Ex. 1, at Ex. 2; Rose Decl., ¶ 13. Burt remained in the Senior Compliance Coordinator position until May 1, 2003, when he assumed another position. Rose Decl., ¶ 13, Ex. 1.

34.    During the entire time Burt was a Senior Compliance Coordinator, he received one increase in his salary. Rose Decl., ¶ 13, Ex. 1. In contrast, Paul received two separate salary increases of 5.1 and 5.3 percent when he was a Senior Compliance Coordinator. McQuade Decl. Ex. 1, at Ex. 2.

35.    To the extent that Burt's salary as a GMP Compliance Specialist or Senior Compliance Coordinator was higher than Paul's salary as a Compliance Coordinator or Senior Compliance Coordinator, it is a result of a number of factors, including the fact that he had far

more work experience than Paul when he was hired, justifying a higher starting salary, and the fact that he received higher performance evaluations than Paul. Rose Decl., ¶ 14.

**Christopher DeFeciani**

36.     DeFeciani was hired by Wyeth in October 1987. Rose Decl., ¶ 16, Ex. 6. From 1987 until the time he became a GMP Compliance Specialist in July 2000, he had worked in a number of different positions at Wyeth and had received a number of different salary increases. Rose Decl., ¶ 16, Ex. 6. Thus, when he was made a GMP Compliance Specialist in July 2000, DeFeciani had nearly 13 years of experience working at Wyeth, and 13 years of salary increases. Rose Decl., ¶ 16, Ex. 6.

37.     DeFeciani was a GMP Compliance Specialist during a completely different time period than when Paul was a Compliance Coordinator or Senior Compliance Coordinator. McQuade Decl. Ex. 1, at Ex. 2; Rose Decl., ¶ 17, Ex. 6.

38.     DeFeciani received an overall rating of "5" or "outstanding" on his annual performance reviews for 2000, 2001, and 2002. Rose Decl., ¶ 18, Exs. 7-9. His 2000 and 2001 reviews were prepared by his supervisor Walter Wardrop, and his 2002 review was prepared by Ingrid Gibson. Rose Decl., ¶ 18, Exs. 7-9.

39.     In January 2001, after receiving a performance rating of "5," DeFeciani received a salary increase of 8.4 percent to $53,149. Rose Decl., ¶ 19, Ex. 6. In April 2001, DeFeciani received a salary increase of 10% to $58,464. Rose Decl., ¶ 19, Ex. 6.

40.     In December 2001, DeFeciani was promoted to the position of Senior Compliance Coordinator and received a corresponding salary increase of 7 percent to $62,556. Rose Decl., ¶ 20, Ex. 6. This is the same percent salary increase Paul received when he was promoted to this position in 2003. McQuade Decl. Ex. 1, at Ex. 2.

41.   In January 2002, after receiving a performance rating of "5" from Ingrid Gibson, DeFeciani received a salary increase of 9.8 percent to $68,694.  Rose Decl., ¶ 20, Ex. 6.

42.   DeFeciani remained in the Senior Compliance Coordinator position until August 1, 2002, when he assumed another position.  Rose Decl., ¶ 21, Ex. 6.  DeFeciani was a Senior Compliance Coordinator during a completely different time period than when Paul was a Senior Compliance Coordinator.  McQuade Decl. Ex. 1, at Ex. 2; Rose Decl., ¶ 21, Ex. 6.

43.   To the extent that DeFeciani's salary as a GMP Compliance Specialist or Senior Compliance Coordinator was higher than Paul's salary as Compliance Coordinator or Senior Compliance Coordinator, it was a result of a number of factors, including the fact that he had significantly more work experience than Paul, had a much longer tenure at Wyeth than Paul, had an extremely diverse work background, and had received higher performance evaluations than Paul.  Rose Decl., ¶ 22.

44.   Paul's sole basis for believing that DeFeciani and Burt were paid more as Compliance Coordinators than he was based on his race was because, according to Paul, DeFeciani and Burt were afforded opportunities to socialize with managers Wardrop, Mackey, and Bracco, by going out to lunch, playing golf, or playing on sporting teams with them, "[w]hereas African Americans weren't really brought out to lunch that often with managers." McQuade Decl. Ex. 1, at 71-73.

45.   Paul, however, admits that he socialized with Bracco and Wardrop. McQuade Decl. Ex. 1, at 73.  In fact, Paul and Bracco went to lunch several times.  Declaration of Robert Bracco ("Bracco Decl."), ¶ 4.  When Paul expressed an interest in learning to play golf, Bracco loaned him a set of clubs and gave him a few tips on the game.  Bracco Decl., ¶ 4. Bracco also provided Paul with the name of the "golf pro" at the Phillip J. Rotella Memorial Golf Course in Theills, New York and recommended that Paul take a few lessons to help him get

started.   Bracco Decl., ¶ 4.   On at least two occasions, Paul went with Bracco and other colleagues on Bracco's boat in Haverstraw Bay after work.  Bracco Decl., ¶ 4.

46.    Paul was unable to "say for certain" that Bracco and Wardrop treated him unfairly because of his race.  McQuade Decl. Ex. 1, at 75-76.  Paul admits that Curry never treated him unfairly because of his race.  McQuade Decl. Ex. 1, at 84.  Paul also admits that Mackey never treated him unfairly based on his race before he became a Senior Material Scheduler in January 2004. McQuade Decl. Ex. 1, at 76.

**Senior Compliance Coordinator Position**

47.    In May 2003, Paul was promoted again to the position of Senior Compliance Coordinator in the Consumer Healthcare Division.  McQuade Decl. Ex. 1, at 55, 81 & Ex. 2.

48.    In connection with this promotion, Paul's salary grade level was increased from "8" to "10," and he received a seven percent increase in his annual salary to $55,112. McQuade Decl. Ex. 1, at 55-56 & Ex. 2.

49.    In July 2003, two months after assuming his duties as Senior Compliance Coordinator, Wyeth increased Paul's salary by an additional 5.1 percent to $57,945.  McQuade Decl. Ex. 1, at 84 & Ex. 2.

50.    Bracco gave Paul an overall rating of "5" or "exceeds expectations" on his annual performance review for 2003.  McQuade Decl. Ex. 1, at 77-79 & Ex. 9.  Andrew Schaschl approved and signed the review as the next level manger.  McQuade Decl. Ex. 1, at 78 & Ex. 9.

51.    On January 1, 2004, Paul received a 5.3 percent increase in his annual salary to $61,037.  McQuade Decl., Ex. 1, at 87 & Ex. 2.

52.     Paul admits that he was not treated unfairly because of his race during the time period from May 2003 through January 2004, the period of time he held the Senior Compliance Coordinator position.  McQuade Decl. Ex. 1, at 84.

**Senior Material Scheduler Position: February 2004 – September 2005**

53.     In late 2003, the Consumer Healthcare Division at Wyeth's Pearl River facility underwent a corporate restructuring referred to as an "Organizational Cascade," under which employees were moved into new positions.  Rose Decl., ¶ 23.  The Organizational Cascade affected all people in the organization.  Rose Decl., ¶ 23.

54.     In connection with the Organizational Cascade, on January 1, 2004, Paul was assigned to a new position as a Senior Material Scheduler, where he was responsible for the purchase and inventory of the necessary raw materials for the production process from outside vendors.  McQuade Decl. Ex. 1, at 85-87, 91-92 & Ex. 2.  When the raw materials were delivered to the facility, they had to be tested by Wyeth's Quality Assurance group to ensure that they met specifications.  McQuade Decl. Ex. 1, at 94.

55.     If the Senior Material Scheduler responsible for ordering raw materials does not order enough raw materials, it can result in a shut down of the manufacturing facility, and Wyeth becomes responsible for paying its work force which is not doing any work as a result of the production shutdown.  McQuade Decl. Ex. 1, at 114.  A Senior Material Scheduler must be assertive with vendors and hold them to their orders, because if the vendors fail to deliver raw materials, then manufacturing operations may have to be shut down or cutback.  McQuade Decl. Ex. 1, at 128-29.

56.     In this position as a Senior Material Scheduler, Paul reported directly to Howard Mackey, then Associate Director for Planning in the Consumer Healthcare Division.  McQuade Decl. Ex. 1, at 87.  Paul's move to the Senior Material Scheduler position was a lateral

transfer that did not negatively impact his salary.  McQuade Decl. Ex. 1, at Ex. 2.  Paul accepted

the transfer, viewing it as a growth opportunity and a positive move for the development of his

career.  McQuade. Decl. Ex. 1, at 85-86.

   57. When Paul first began in this position, he trained under Robert "Butch"

Babcock, who he was replacing as the Senior Material Scheduler covering raw materials.

McQuade Decl. Ex. 1, at 90; Declaration of Howard Mackey ("Mackey Decl."), ¶ 5.  Paul

continued to work with Babcock until July 2004, so that Babcock could help Paul learn the job.

Mackey Decl., ¶ 5, Ex. 1.

   58. When Paul assumed the Senior Material Scheduler position in February

2004, he sat on the third floor.  McQuade Decl. Ex. 1, at 138-39.  With the exception of

Babcock, the Material Schedulers worked on the fifth floor.  McQuade Decl. Ex. 1, at 139;

Mackey Decl., ¶ 6.  After Mackey moved to the fifth floor in August 2004, he asked Paul to

move to the fifth floor on several occasions because he believed that Paul would have an easier

time learning his job if he sat closer to the other Senior Material Schedulers.  Mackey Decl., ¶ 6.

Despite Mackey's repeated requests that Paul move to the fifth floor, he did not do so until

February 2005, more than a year after he assumed the position of Senior Material Scheduler.

Mackey Decl., ¶ 6.  Paul admits that sitting with the other Material Schedulers was beneficial for

learning his job.  McQuade Decl. Ex. 1, at 140-41.

   59. Paul received a quarterly review from Mackey in June 2004.  McQuade

Decl. Ex. 1, at Ex. 14; Mackey Decl., ¶ 7.  The review was positive, and identified as an area of

improvement that Paul should be more assertive at meetings to ensure that his issues and

concerns were understood and addressed.  McQuade Decl. Ex. 1, at Ex. 14; Mackey Decl., ¶ 7.

   60. On or about September 17, 2004, there was a problem relating to the

delivery of Ditab, a raw material that Paul was ultimately responsible for having delivered on

time.  McQuade Decl. Ex. 1, at 146-48 & Ex. 19.  As a result of this delivery problem, productivity was lost.  McQuade Decl. Ex. 1, at Ex. 19.  On September 27, 2004, there was another shortage of Ditab, for which Paul was ultimately responsible.  Mackey Decl., ¶ 9, Ex. 4. This shortage of Ditab caused production to decrease for a period of time.  Mackey Decl., ¶ 9, Ex. 4.

61.    In the final week of September 2004 and/or early October 2004, there was a critical shortage of Zinc Oxide, which is an important raw ingredient used in many of the products manufactured at the Pearl River facility.  McQuade Decl. Ex. 1, at 142; Mackey Decl., ¶ 10.  Paul was responsible for this shortage.  McQuade Decl. Ex. 1, at 118, 120-21, 152-53; Mackey Decl., ¶ 10.

62.    The shortage of Zinc Oxide caused a shutdown of all production of Centrum and Silver, two important products manufactured at Pearl River.  Mackey Decl., ¶ 10. Moreover, because Zinc Oxide was used in so many products manufactured at Pearl River, there was a threat of a massive shutdown of manufacturing operations at the facility.  Mackey Decl., ¶ 11.  Mackey intervened to help get more Zinc Oxide delivered to the Pearl River facility to help avert a wide-scale production shutdown.  Mackey Decl., ¶ 11.

63.    Mackey also had to advise Lou Smuckler, who was then the Director of the Pearl River Facility, Jim Rowan, who was then responsible for labor relations, and Carol Carino, who was then in a finance role, of the shortage of Zinc Oxide because the shortage of the raw material had the potential to completely shut down production, leaving all of the manufacturing employees at the Pearl River facility out of work.  McQuade Decl. Ex. 1, at 149-51; Mackey Decl., ¶ 12.

64.    In an October 2, 2004 email to Mackey, Paul referred to the Zinc Oxide shortage as an "urgent raw material issue[]."  McQuade Decl. Ex. 1, at Ex. 20.  Mackey

responded to this email by telling Paul that it is "critical we get our hands on this situation" and they "need to work through this Zinc Oxide crisis and ensure there are no other ones on the way." McQuade Decl. Ex. 1, at Ex. 20; Mackey Decl., ¶ 13. Mackey further advised Paul that he was "counting on [Paul] to right the ship" and that "[i]f [he] need[ed] a hand with don't hesitate to ask me or anyone else." McQuade Decl. Ex. 1, at Ex. 20. Finally, Mackey encouraged Paul to "[k]eep [his] head up." McQuade Decl. Ex. 1, at Ex. 20. Paul responded as follows:

> Thank you and I am on board to rectify the situation. Very tough lesson, but nonetheless... I have learned. I appreciate the support and I will not hesitate to ask.

McQuade Decl. Ex. 1, at Ex. 20; Mackey Decl., ¶ 13.

65.    Paul admits that he alone was responsible for the shortfall of Zinc Oxide.

McQuade Decl. Ex. 1, at 118, 120-21, 152-53. As he testified at his deposition:

> Q:    Do you feel that you were unfairly singled out in any way as a result of this [Zinc Oxide] incident?
>
> A.    No, it was my responsibility, I didn't get the confirmation. So I accepted the responsibility, it was an error.

McQuade Decl. Ex. 1, at 154.

66.    Mackey prepared Paul's 2004 annual performance review and gave Paul an overall rating of "3" or on target. McQuade Decl. Ex. 1, at 154-58 & Ex. 16; Mackey Decl., ¶ 14. Mackey thought that it was a close call between granting a rating of "3" or "4" for Paul, but ultimately decided that the "3" rating would be more appropriate, particularly in light of the recent Zinc Oxide crisis and other shortages of raw materials, and the fact that other managers had told Mackey that they had experienced difficulties with the delivery of certain materials Paul was responsible for during the past year. Mackey Decl., ¶ 14. In addition, Mackey thought the "3" rating was fair, given the fact that this was Paul's first year in this position, and employees

often get a "3" rating in the first year after assuming an entirely new position.  Mackey Decl.,
¶ 14.

67.    The Zinc Oxide crisis not only affected Paul's performance rating for
2005, but it also affected Mackey's performance rating, as Paul's supervisor.  Mackey Decl.,
¶ 15.  Mackey received an overall performance rating of a "3" down from a "4" in part because
of the Zinc Oxide crisis.  Mackey Decl., ¶ 15.

68.    Paul admits that a "3" rating is not a negative rating, but instead is an
average rating.  McQuade Decl. Ex. 1, at 158-59.

69.    Paul prepared a lengthy written rebuttal to his 2004 annual performance
review.  McQuade Decl. Ex. 1, at Ex. 17.  In this document, he conceded that the "incident of
Zinc Oxide . . . contributed to a shutdown in production."  McQuade Decl. Ex. 1, at Ex. 17, p.
28.

70.    For example, Paul disputes the statement that he spent the first six months
of his job working under the outgoing material scheduler (Robert "Butch" Babcock) and claims
he was managing a "majority" of the raw material planning function on his own as of April 2004.
McQuade Decl. Ex. 1, at Ex. 17, p. 31.

71.    He also disputes that production had been "'shutdown at times due to raw
material availability,'" and claims that a "majority of those were not shutdowns[, but instead
were] just interruptions due to availability of materials."  McQuade Decl. Ex. 1, at Ex. 17, p. 31.

72.    Paul spoke to Rose about the review, and Rose told him that the review
was not bad and encouraged Paul to "keep plugging away."  McQuade Decl. Ex. 1, at 160.  At
the time Paul spoke to Rose, he did not believe that the review was discriminatory in any way
based on his race, and he made no such complaint to Rose.  McQuade Decl. Ex. 1, at 161-162.

73.     In February 2005, at Paul's request, Joseph Vitanza, a Managing Director at the time, met with Paul regarding his 2004 performance review.  McQuade Decl. Ex. 1, at 163-165; Declaration of Joseph Vitanza ("Vitanza Decl."), ¶ 3.  During this meeting, Paul told Vitanza that he was expecting a rating of a "4."  McQuade Decl. Ex. 1, at 164; Vitanza Decl. ¶ 3. Vitanza told Paul that he should not be discouraged by his rating, that he had a bright future with the company, and that he needed to stay focused.  McQuade Decl. Ex. 1, at 164-65; Vitanza Decl. ¶ 3.

74.     On January 1, 2005, Paul received an annual salary increase of 3.8 percent to $63,356.  McQuade Decl. Ex. 1, at 166 & Ex. 2.

75.     On July 1, 2005, Paul received a salary increase of 3.5 percent to $65,573. McQuade Decl. Ex. 1, at 166 & Ex. 2.

**Paul's Alleged Comparators in the Senior Material Scheduler Position**

76.     According to Paul, the other Senior Material Schedulers during this time period were Lynn Edsall, Pasqua Castricato, Anne Menchini, and Susan Bender.  McQuade Decl. Ex. 1, at 89.  Paul admits that these other Senior Material Schedulers each had a different role and different job responsibilities than he did.  McQuade Decl. Ex. 1, at 92-93.

77.     Unlike Paul who was responsible for purchasing and inventorying raw materials from outside vendors, Edsall, Castricato, Menchini, and Bender were responsible for delivering materials to the various production areas within the Pearl River facility.  Mackey Decl., ¶ 4.

**Pasqua Castricato**

78.     Castricato was hired by Wyeth in May 1982, and worked in a number of positions before becoming an Associate Material Scheduler in 1997 with a salary of $36,324. Rose Decl., ¶¶ 27-28, Ex. 10.  After serving as an Associate Material Scheduler for more than

two years and after receiving two separate annual salary increases, Castricato was promoted to the position of Material Scheduler in January 2000 with a salary of $45,595. Rose Decl., ¶ 28, Ex. 10. After serving as a Material Scheduler for four years, and after receiving an additional five salary increases, Castricato was promoted to the position of Senior Material Scheduler on January 2, 2004 with a salary of $62,617. Rose Decl., ¶ 28, Ex. 10.

79.    Castricato's starting salary as a Senior Material Scheduler was higher than Paul's starting salary as a Senior Material Scheduler for a number of reasons, including her twenty-two year tenure at Wyeth, her nearly seven years of experience performing material scheduler responsibilities as an Associate Material Scheduler and a Material Scheduler, and the result of a number of salary increases occurring at different times over the course of her twenty-two years at Wyeth. Rose Decl., ¶ 29.

80.    During the entire time that Castricato and Paul were Senior Material Schedulers (January 2, 2004 through September 27, 2005), Paul received both higher percentage increases in his salary and higher total dollar increases in his salary than Castricato. Rose Decl., ¶ 30.

81.    As a Senior Material Scheduler, Castricato reported directly to Andrew Espejo. Rose Decl., ¶ 31. Espejo gave Castricato an overall performance rating of "3" in her 2004 performance review, which was the same rating that Paul received for that year. Rose Decl., ¶ 31, Ex. 12.

82.    In January 2005, Castricato received a 3.5 percent salary increase, which was less than Paul's 3.8 percent salary increase in January 2005. McQuade Decl. Ex. 1, at Ex. 2; Rose Decl., ¶ 32, Ex. 10.

83.    In July 2005, Castricato received a 1.5 percent salary increase, which was less than Paul's 3.5 percent salary increase in July 2005.  McQuade Decl. Ex. 1, at Ex. 2; Rose Decl., ¶ 32, Ex. 10.

**Lynn Edsall**

84.    Edsall was hired by Wyeth in January 1982, and worked in a number of positions before becoming an Associate Material Scheduler in 1996 with a salary of $44,661. Rose Decl., ¶¶ 33-34, Ex. 14.    After serving as an Associate Material Scheduler for approximately seven months, Edsall was promoted to the position of Material Scheduler in August 1997 with a salary of $52,567.  Rose Decl., ¶ 34, Ex. 14.  After serving as a Material Scheduler for four and a half years, and after receiving an additional four annual salary increases, Edsall was promoted to the position of Senior Material Scheduler on January 1, 2002 with a salary of $70,311.  Rose Decl., ¶ 34, Ex. 14.  After two additional salary increases, as of January 2, 2004, when Paul became a Senior Material Scheduler, Edsall's salary was $76,049. Rose Decl., ¶ 34, Ex. 14.

85.    Edsall's starting salary as a Senior Material Scheduler was higher than Paul's starting salary as a Senior Material Scheduler for a number of reasons, including her over twenty-two year tenure at Wyeth, her seven years of experience performing material scheduler responsibilities as an Associate Material Scheduler, Material Scheduler, and Senior Material Scheduler, her performance, and as a cumulative result of a number of salary increases occurring at different times over the course of her twenty-two years at Wyeth.  Rose Decl., ¶ 35.

86.    For the years 1999 through 2001, as a Material Scheduler, Edsall reported to Jack Riley and received the highest possible performance rating in each of those years.  Rose Decl., ¶ 36, Exs. 15-17.  In 2002, as a Senior Material Scheduler, Edsall reported to Anne Menchini, then a Manager of Product Planning, and received an overall performance rating of a

"4" on her 2002 performance review. Rose Decl., ¶ 36, Ex. 18. In 2003, as a Senior Material Scheduler, Edsall reported to Patricia Keenan, then a Senior Team Leader of Planning, and received an overall performance rating of a "4" on her 2003 performance review. Rose Decl., ¶ 36, Ex. 19. In 2004, as a Senior Material Scheduler, Edsall reported directly to Walter Wardrop and received an overall performance rating of a "4" on her 2004 performance review. Rose Decl., ¶ 36, Ex. 20. In 2005, Edsall continued to report to Wardrop, and received an overall performance rating of a "5" on her 2005 performance review. Rose Decl., ¶ 36, Ex. 21.

87.     In January 2005, Edsall received a 4.5 percent salary increase. Rose Decl., ¶ 37, Ex. 14. Her percentage increase was higher than Paul's based on her higher performance evaluations. Rose Decl., ¶ 37, Ex. 14. Edsall received no other salary increase in 2005. Rose Decl., ¶ 37, Ex. 14. Thus, during the entire time that both Edsall and Paul were Senior Material Schedulers (January 2, 2004 through September 27, 2005), Paul received both a higher total percentage increase in his salary and a higher total dollar increase in his salary than Edsall. McQuade Decl. Ex. 1, at Ex. 2; Rose Decl., ¶ 37, Ex. 14.

**Anne Menchini**

88.     Menchini was hired by Wyeth in April 1977, and worked in a number of positions before becoming a Material Scheduler in 1996 with a salary of $47,640. Rose Decl., ¶¶ 38-39, Ex. 22. Menchini served as a Material Scheduler and Senior Material Scheduler for more than four years during the time period of 1996 to 2001, and received a number of salary increases over those years. Rose Decl., ¶ 39, Ex. 22.

89.     Menchini's 2000 and 2001 performance reviews were prepared by Jack Riley, then a Director of Consumer Health and later a Director of Manufacturing, and Menchini received an overall performance rating of "4" in each of those reviews. Rose Decl., ¶ 40, Ex. 23 & 24.

90.     In September 2001, Menchini was promoted to the position of Manager of Production Planning, and she received a corresponding salary increase to $73,429 and a salary grade level of 12.  Rose Decl., ¶ 41, Ex. 22.  As a Manager of Production Planning, Menchini was responsible for supervising Material Schedulers and Senior Material Schedulers, and she received a number of salary increases while holding this position. Rose Decl., ¶ 41, Ex. 22.

91.     From October 2002 through January 1, 2004, Menchini held the position of Project Manager, and she received additional salary increases during this time period.  Rose Decl., ¶ 42, Ex. 22.

92.     Menchini received overall performance ratings of a "3" for 2002 and 2003, and those reviews were prepared by Joseph Vitanza, then a Director of Manufacturing Support, for 2002, and Dave Quinones, then a SAP Project Team Manager, for 2003.  Rose Decl., ¶ 43, Exs. 25 & 26.

93. On January 2, 2004, after her position was eliminated, Menchini became a Senior Material Scheduler, a position she had held for several years many years prior.  Rose Decl., ¶ 44, Ex. 22. Although this position was a significant step down for Menchini, she was permitted to retain the salary level from her prior position, which had been built up over many years.  Rose Decl., ¶ 44, Ex. 22.  Her salary grade level was reduced from 12 to 10, and her salary remained the same, $83,579, when she assumed this position. Rose Decl., ¶ 44, Ex. 22.

94.     As a Senior Material Scheduler in 2004 and 2005, Menchini reported to Kevin Costello, and Costello gave Menchini an overall performance rating of a "4" in 2004 and an overall performance rating of a "3" in 2005.  Rose Decl., ¶ 45, Exs. 27 & 28.

95.     Menchini's starting salary as a Senior Material Scheduler on January 2, 2004 was higher than Paul's starting salary as a Senior Material Scheduler for a number of reasons, including Menchini's over twenty-seven year tenure at Wyeth, her more than five years

of experience performing material scheduler responsibilities as an Associate Material Scheduler, Material Scheduler, and Senior Material Scheduler, her performance, and as a cumulative result of a number of salary increases occurring at different times over the course of her twenty-seven years at Wyeth. Rose Decl., ¶ 46.

96.    In January 2005, Menchini received a 2.5 percent salary increase, which was less than Paul's 3.5 percent salary increase on January 1, 2005. McQuade Decl. Ex. 1, at Ex. 2; Rose Decl., ¶ 47, Ex. 22. Menchini received no other salary increase in 2005. Rose Decl., ¶ 47, Ex. 22. Thus, during the entire time that both Menchini and Paul were Senior Material Schedulers (January 2, 2004 through September 27, 2005), Paul received both a higher total percentage increase in his salary and a higher total dollar increase in his salary than Menchini. McQuade Decl. Ex. 1, at Ex. 2; Rose Decl., ¶ 47, Ex. 22.

**Susan Bender**

97.    Bender was hired by Wyeth in June 1985, and worked in a number of positions before becoming a Material Scheduler in July 2003, and a Senior Material Scheduler on January 2, 2004 with a salary of $57,410. Rose Decl., ¶¶ 48-49, Ex. 29. For the years 2001 through 2005, Bender received overall performance ratings of a "4," except in the year 2004, when she received an overall performance rating of a "3." Rose Decl., ¶ 49, Ex. 29. In 2004 and 2005, Bender reported to Kevin Costello. Rose Decl., ¶ 49.

98.    At no time during Bender's employment at Wyeth, was she paid more than Paul. McQuade Decl. Ex. 1, at Ex. 2; Rose Decl., ¶ 50.

99.    Paul never complained to anyone that he believed any of these four women was paid more than he was. McQuade Decl., Ex. 1, at 100.

100.    Paul believes that it is possible for someone to perform the Senior Material Scheduler position without having a college degree. McQuade Decl. Ex. 1, at 99.

101.    At his deposition, Paul testified that he did not know the salary, performance ratings, or background with respect to any of these four women.  McQuade Decl. Ex. 1, at 97-100.

**Associate Director Project Management Position**

102.    In May 2005, Wyeth decided to form a special Compliance Implementation Team (the "CIT") which would be responsible for working on compliance and quality assurance issues.  Declaration of Maura Corcoran ("Corcoran Decl."), ¶ 2; Gibson Decl., ¶ 6.  The individuals selected for the CIT were to report to Maura Corcoran, who was then a Director of Audits.  Corcoran Decl. ¶ 2; Gibson Decl., ¶ 6.

103.    In May 2005, Paul expressed interest in a position on the CIT by emailing his resume to Maura Corcoran.  McQuade Decl. Ex. 1, at 173-176.  Paul had never met Maura Corcoran.  McQuade Decl. Ex. 1, at 176.

104.    In hiring for this team, Corcoran was looking for individuals who had extensive project management skills, strong leadership skills, skills in a particular area such as aseptic manufacturing, environmental monitoring, investigations, or quality assurance.  Corcoran Decl., ¶ 3.  In addition, Corcoran was looking for people who were highly motivated, assertive, and aggressive.  Corcoran Decl., ¶ 3.

105.    Maura Corcoran and a group of managers then met to discuss who would be interviewed for the CIT.  Corcoran Decl., ¶ 4; Gibson Decl., ¶ 8.  Most of these managers did not even know who Paul was.  Gibson Decl., ¶ 9.  When Paul's name came up for discussion, Gibson described Paul as being very laid back and having a very mellow personality.  Gibson Decl., ¶ 9.  Gibson believes that her comments may have eliminated Paul from consideration for being selected for an interview, because Corcoran and the remainder of the group were looking for an individual who was very aggressive and assertive.  Gibson Decl., ¶ 9.  Corcoran ultimately

decided who would be interviewed, and Paul was not one of the individuals selected. Gibson Decl., ¶ 9. Gibson did not disagree with the decision not to interview Paul because she did not believe that Paul had the experience, personality, or leadership style needed for the position. Gibson Decl., ¶ 9.

       106.   Michael Curry was unanimously chosen by the group to fill the position of Associate Director, Project Management on the CIT. McQuade Decl. Ex. 1, at 177 & Ex. 21; Corcoran Decl., ¶ 5; Gibson Decl., ¶ 10. Curry was viewed as the best candidate for the position for a number of reasons. Corcoran Decl., ¶ 5. First, Curry's experience and background made him an excellent candidate for the position. Corcoran Decl., ¶ 5; Gibson Decl., ¶ 10. Before joining Wyeth in 2002, Curry had over ten years of relevant work experience in the pharmaceutical industry, working as an Assistant Scientist, Senior Analytical Biologist, Supervisor, and Manager of BioScience Manufacturing. Corcoran Decl., ¶ 5 & Ex. 1. In addition, at Wyeth, Curry had further relevant experience working as a Scientist in Quality Assurance from June 2002 through November 2002, as a Manager and a Compliance Manager from December 2002 through October 2004, and as Manager in Quality Assurance and an Associate Director of Quality Assurance from November 2004 through June 2005. McQuade Decl. Ex. 1, at Ex. 21; Corcoran Decl., ¶ 5. Curry reported directly to Corcoran in many of these positions at Wyeth, so she was very familiar with him and his capabilities. Corcoran Decl., ¶ 5. He had extensive management experience, an aseptic background, and significant compliance experience, all of which would be extremely helpful in this position. Corcoran Decl., ¶ 5; Gibson Decl., ¶ 10. Curry also had a Bachelor of Science Degree in Biology and a Master's Degree in Microbiology, both of which would be directly relevant to his work in this position. Corcoran Decl., ¶ 5 & Ex. 1.

107.   Paul does not believe that he was more qualified for the position than Curry.  McQuade Decl. Ex. 1, at 182.  When asked at his deposition if he belied that he was not selected for this position because of his race, Paul responded: "I don't know."  McQuade Decl. Ex. 1, at 183-184.

**Paul's Alleged Interest In The Newly-Created Managerial Positions in July 2005**

108.   In July 2005, three new managerial positions were created as part of a reorganization in the Consumer Health Division – a Production Manager position, a Manager Production position, and a Packaging Manager position.  Rose Decl., ¶ 51.  Paul did not apply for, or tell anyone he was interested in, any of these three positions.  McQuade Decl. Ex. 1, at 186-91.

109.   Chris DeFeciani was chosen to fill the newly-created Production Manager position in July 2005, reporting to Walter Wardrop.  Rose Decl., ¶ 52.  DeFeciani was selected because he was viewed as the best available candidate due to his leadership capabilities, his extensive experience, and his managerial capabilities.  Rose Decl., ¶ 52.  In addition, the Production Manager position was expected to be similar to the position DeFeciani previously held as Manager of Manufacturing Support, and he had been performing that job well.  Rose Decl., ¶ 52.  DeFeciani's performance rating for 2005 was a "5."  Rose Decl., ¶ 52 & Ex. 6.

110.   Jennifer Hallock was selected to fill the newly-created Manager Production position in July 2005, working on the second shift and reporting to Walter Wardrop.  Rose Decl., ¶ 53.  Hallock was selected for this position because she was viewed as the best available candidate for this position based on her work experience, work in the Quality organizations where she held positions of increasing responsibility, skills, and perceived potential.  Rose Decl., ¶ 53.  The Manager Production position was expected to be similar to the position Hallock held as a Supervisor of Production, and she had performed that job well,

providing additional confidence that she would succeed in this new position. Rose Decl., ¶ 53. Hallock's performance rating for 2005 was a "4." Rose Decl., ¶ 53.

111.    Francis McDermott was selected to fill the newly-created position of Packaging Manager, reporting to Monte Bradford, because he already had been performing a similar position as a Manager of Packaging Support and had been doing that job very well. Rose Decl., ¶ 54. McDermott's performance rating for 2005 was a "5." Rose Decl., ¶ 54. Paul admitted at his deposition that he has no reason to believe that he was not selected for this position because of his race. McQuade Decl. Ex. 1, at 192.

**Paul's Interest In The Production Manager Position**

112.    In    2005, Paul expressed interest in a Production Manager position reporting to Kevin Costello. Declaration of Kevin Costello ("Costello Decl."), ¶¶ 2-4. Costello was looking to hire an individual who had, among other things, seven to nine years of manufacturing related experience, including three years of supervisory/decision-making experience. Costello Decl., ¶ 3.

113.    Costello selected Daniel Ferry for this position because he believed Ferry was the best candidate for the position based on his extensive manufacturing experience, his managerial and supervisory experience, and his compliance background. Costello Decl., ¶ 4.

114.    At the time Costello hired Ferry for this position, Ferry was employed as an Assistant Director of Manufacturing and Pharmacy at Solgar Vitamin and Herb. Costello Decl., ¶¶ 5-6 & Ex. 2. Ferry had approximately six years of experience working in a regulated manufacturing environment at Solgar in various managerial and supervisory positions. Costello Decl., ¶ 5. Before that, Ferry had worked as an Operations Manager at Health Tech Inc. for approximately seven years in a regulated manufacturing environment, where he had extensive management and supervisory responsibilities. Costello Decl., ¶ 5. Before that, Ferry had several

years of managerial and supervisory experience for Penske Truck Leasing. Costello Decl., ¶ 5. In addition, Ferry was very highly recommended by the people he worked with at Solgar. Costello Decl., ¶ 5.

115. Paul did not have the same level of manufacturing experience or managerial and supervisory experience as Ferry. Costello Decl., ¶ 7.

116. In any event, Paul was ineligible and could not be selected for this position because it would have involved a three-level salary grade increase. Rose Decl., ¶ 6.

117. Paul admitted at his deposition that he had no reason to believe that Costello selected Ferry because of his race. McQuade Decl. Ex. 1, at 192.

**Paul's Search For Work And Resignation From Wyeth**

118. On June 18, 2004, Debra Pohl, of Alternative Resources Company, a staffing services company, submitted Paul's resume on his behalf to Par Pharmaceutical, Inc. for a QA Associate position. McQuade Decl., Ex. 2. At about this same time, Paul expressed his dissatisfaction to Bracco with the Senior Material Scheduler position. ("Bracco Decl."), ¶ 3. Paul told Bracco that he was looking into job opportunities outside of Wyeth, and asked Bracco to write a letter of recommendation that he could submit to potential employers. Bracco Decl., ¶ 3. Bracco complied with Paul's request and provided him with a letter of recommendation. Bracco Decl., ¶ 3.

119. In early July 2005, Paul told Gibson that he was applying for a position with Par Pharmaceutical, Inc. and asked if she would write a letter of reference on his behalf. Gibson Decl., ¶ 12. According to Paul, as of at least July 13, 2005, he was having serious thoughts of leaving Wyeth because he "started feeling exhausted and just not appreciated." McQuade Decl. Ex. 1, at 194. As of this time, Paul felt that "some days" of work were

intolerable because "he felt like very little appreciation" from managers.  McQuade Decl. Ex. 1, at 194-95.

120.    Paul submitted his resume to Par Pharmaceutical at some point before August 17, 2005.  McQuade Decl., ¶ 4 & Ex. 3.  On August 23, 2005, Paul was interviewed by Par Pharmaceutical for a position as a QA Specialist.  McQuade Decl., ¶ 4 & Ex. 3.  On September 2, 2005, Paul accepted employment with Par Pharmaceutical, and on September 12, 2007, he signed an offer letter from Par Pharmaceutical.  McQuade Decl.¶¶ 5, 6 & Exs. 4-5.

121.    At about this same time Paul advised his supervisor, Monte Bradford, that he planned to resign, and Bradford told him to talk to Vitanza.  McQuade Decl. Ex. 1, at 198-99. Paul met with Vitanza and told him that he was resigning from his position.  McQuade Decl. Ex. 1, at 199.  During this meeting, Vitanza told Paul that he was being considered for a lateral move to a quality position as part of an upcoming organizational cascade.  McQuade Decl. Ex. 1, at 196-198.  Prior to this meeting, and prior to tendering his resignation, Paul did not know what position he would have received as part of the upcoming corporate re-organization.  McQuade Decl. Ex. 1, at 200.

122.    Paul continued working at Wyeth until September 27, 2005.  McQuade Decl. Ex. 1, at Ex. 2.

Dated: New York, New York
       August 28, 2007

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _____
       Michael Delikat
       James H. McQuade
       666 Fifth Avenue
       New York, New York 10103
       (212) 506-5000

Attorneys for Wyeth Pharmaceuticals, Inc.