UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
NEWTON PAUL

                    Plaintiff,

                                                    07 Civ. 950 (CLB)
          - against -
                                                    *Memorandum and Order*

WYETH PHARMACEUTICALS, INC.,

                    Defendant.
--------------------------------------------------------x
Brieant, J.

          Defendant Wyeth Pharmaceuticals filed this motion for summary judgment on Plaintiff

Newton Paul's employment discrimination claims on August 28, 2007.  (Doc. 13.)  Plaintiff filed

his opposition on October 8, 2007 and Defendant filed a reply on October 22, 2007.  This Court

heard oral arguments on October 26, 2007 and reserved decision.

## Facts

          The following facts are assumed to be true for the purposes of this motion only.  In

August 2000, Defendant hired Plaintiff, a black male of Haitian descent, as a Production

Supervisor.  His starting salary was $44,100.

          Wyeth had a system for rating its employees' performance on a scale of 1 to 5, with 1

meaning "unsatisfactory," 2 meaning below "expectations," 3 meaning "solid performer," 4

meaning "exceeds expectations," and 5 meaning "outstanding."  In his annual performance

reviews for the years 2000 and 2001, Plaintiff received performance ratings of 3, or "solid

performer."  In January 2001, Plaintiff received a 3% increase in his annual salary to $45,460.

In January 2002, he received another 3% increase in his annual salary to $46,824.  When asked

at his deposition whether he "believe[d] that prior to February 2002 [he was] discriminated

against . . . in any way because of [his] race," Plaintiff responded "No, I can't say, no." (McQuade Decl., Ex. 1, at 54:17-21.)

In February 2002, Plaintiff was promoted to the position of Compliance Coordinator in the Consumer Healthcare Division. His salary grade level was increased from 6 to 8 and his annual salary was increased to $51,506. Defendant alleges that this 10% increase from his prior salary was the maximum increase Plaintiff could have received at that time. (Def.'s 56.1 Stmt. ¶ 22.) Plaintiff claims it was only a "subtle increase in salary." (Pl.'s 56.1 Stmt. ¶ 22.) In this position, his direct supervisor was Ingrid Gibson, Manager of Investigations, who was a black female. She gave him an overall rating of 4, or "exceeds expectations," in his 2002 annual performance review.

In late 2002, Plaintiff complained to Ms. Gibson that he felt two other employees, Derek Burt and Christopher DeFeciani, were paid more than he was. (Def.'s 56.1 Stmt. ¶ 24.) The parties dispute whether Plaintiff referred to his race in connection with the alleged pay discrepancy. Plaintiff alleges that after Ms. Gibson looked into the discrepancy, he was given an increase in pay. His employment record shows that his salary remained $51,506 from February 2002 through May 2003, the entire time Plaintiff was a Compliance Coordinator. The Defendant alleges that Ms. Gibson's supervisor, Andrew Schaschl, "had intended to give Mr. Paul a salary increase in connection with the annual salary increases that typically take effect in January 2003," but Wyeth "delayed the salary increases until July 2003." (Def.'s 56.1 Stmt. ¶ 26.) In the interim, in May 2003, Plaintiff was promoted to Senior Compliance Coordinator and his salary was increased to $55,112. Two months later, in July 2003, his salary was increased an additional 5.1% to $57,945. (Def.'s 56.1 Stmt. ¶¶ 48, 49; Morelli Decl. Ex. 2.) Following his 2003 annual

performance evaluation of 5 or "exceeds expectations," Plaintiff received a 5.3% increase in salary in January 2004 to $61,037.  (Def.'s 56.1 Stmt. ¶ 51; Morelli Decl. Ex. 2.)

Mr. Burt and Mr. DeFeciani were the only employees in compliance that Plaintiff believes were paid more than he was due to his race.  Both were white.  The one other Compliance Coordinator with whom Plaintiff worked at that time, Leon Williams, was black.

Mr. Burt was hired by Wyeth in 1999 as a Packaging Supervisor and started with more than eight years of job experience, although the parties dispute whether his job experience was "relevant job experience" and dispute his other qualifications for the position.  Mr. Burt's starting salary was $54,900.  Mr. Burt received an overall rating of 5 or "outstanding" on his annual performance reviews for 2000/2001 and 2002, and a rating of 4 or "exceeds expectations" for 2003.  Mr. Burt was promoted to GMP Compliance Specialist in October 2000 and received a salary increase of 7% to $58,743.  In January 2001, he received another salary increase of 4.4% to $61,351.  In December 2001, Mr. Burt was promoted to Senior Compliance Coordinator and received a corresponding salary increase of 7% to $65,646.  Mr. Burt ceased working as a Senior Compliance Coordinator on May 1, 2003, the same day Plaintiff started as a Senior Compliance Coordinator.

Mr. DeFeciani was hired by Wyeth in 1987.  He worked in a number of different positions at Wyeth, with corresponding salary increases, and became a GMP Compliance Specialist in July 2000 at a salary of $49,032.  (Def.'s 56.1 Stmt. ¶ 38.)  Mr. DeFeciani received performance ratings of 5 or "outstanding" on his annual performance reviews for 2000, 2001, and 2002.  Plaintiff contends that he and Mr. DeFeciani "were both in Compliance at the same time, both had the same duties and responsibilities, thus both were equally qualified, thus should

have made the same salary." (Pl.'s 56.1 Stmt. ¶ 37.) However, as Defendant points out and as apparent from the employee profiles that Plaintiff attached as Exhibits 2 and 4 to the declaration of Steven Morelli, Mr. DeFeciani was a GMP Compliance Specialist from July 2000 to December 2001 and a Senior Compliance Coordinator from December 2001 to August 2002, whereas Plaintiff was a Compliance Coordinator from February 2002 to May 2003 and a Senior Compliance Coordinator from May 2003 to January 2004. Plaintiff and Mr. DeFeciani only overlapped in the area of compliance for approximately six months, during which time they did not hold the same position. Mr. DeFeciani's salary as a Senior Compliance Coordinator, which started at $62,556 in December 2001 and increased to $68,694 by August 2002, was greater than Plaintiff's salary as a Senior Compliance Coordinator, which started at $55,112 in May 2003 and increased to $61,037 in January 2004. However, Mr. DeFeciani had been working at the company over 13 years when he became Senior Compliance Coordinator, whereas Plaintiff had been working at Wyeth for less than three years when he became a Senior Compliance Coordinator. Defendant also maintains that Mr. DeFeciani had significantly more work experience, an extremely diverse work background, and higher performance evaluations that Plaintiff, but Plaintiff disputes that these factors were the basis for Mr. DeFeciani's higher salary. (Def.'s 56.1 Stmt. ¶ 43.)

Plaintiff contends that Mr. DeFeciani "was afforded more opportunities by the managers to spend more time with them outside the office." (Pl.'s 56.1 Stmt. ¶ 38.) He admits, however, that "he has socialized with managers [Robert] Bracco and [Walter] Wardrop . . . approximately four times" and that Mr. Bracco loaned him a set of golf clubs and recommended a golf pro for

lessons, but that Bracco "failed to invite [Plaintiff] on the golf outings [with] white employees . . . or . . . invite [Plaintiff] on his boat." (Pl.'s 56.1 Stmt. ¶ 45.)

In late 2003, the Consumer Healthcare Division at Wyeth's Pearl River facility underwent a corporate restructuring, or "Organizational Cascade," which affected all employees and resulted in employees being moved to new positions. (Def.'s 56.1 Stmt. ¶ 53.) Beginning January 1, 2004, Plaintiff was moved laterally to a new position, Senior Material Scheduler. (Pl.'s 56.1 Stmt. ¶ 54; Def.'s 56.1 Stmt. ¶¶ 54, 56.) His salary remained the same, $61,037. (Pl.'s 56.1 Stmt. ¶ 56.)

As a Senior Material Scheduler, Plaintiff was responsible for the purchase and inventory of raw materials from outside vendors. (Pl.'s 56.1 Stmt. ¶ 54; Def.'s 56.1 Stmt. ¶¶ 54, 56.) Failure of vendors to deliver the necessary raw materials could have resulted in a shut down or cut back in manufacturing operations. (Def.'s 56.1 Stmt. ¶ 55.) Plaintiff trained for the position under Robert "Butch" Babcock, whom he was replacing as Senior Material Scheduler. (Def.'s 56.1 Stmt. ¶ 57.) Plaintiff's supervisor was Howard Mackey, then Associate Director for Planning in the Consumer Healthcare Division. (Def.'s 56.1 Stmt. ¶ 56.) Plaintiff received a quarterly review from Mr. Mackey in June 2004 that was positive. (Def.'s 56.1 Stmt. ¶ 59; Pl.'s 56.1 Stmt. ¶ 59.)

On two separate occasions in September 2004, the plant experienced a shortage of DiTab, a raw material that Plaintiff was responsible for procuring. (Def.'s 56.1 Stmt. ¶ 60.) Plaintiff maintains that Defendant "blamed [Plaintiff] for the shortage" even though Plaintiff had previously met with his supervisors "concerning efficiency of the raw materials" and informed

his supervisor that "the other production planners were using the raw materials well before scheduled." (Pl.'s 56.1 Stmt. ¶ 60.)

In late September 2004 and/or October 2004, the plant experienced a shortage of Zinc Oxide, which Plaintiff was responsible for procuring. (Pl.'s 56.1 Stmt. ¶ 61; McQuade Decl. Ex. 1, at 118.) The parties disagree on whether the shortage caused a shutdown of all production of Centrum and Silver, two products manufactured at the Pearl River plant, and whether the shortage threatened a shutdown of all manufacturing operations at the facility. (Def.'s 56.1 Stmt. ¶ 62, 63; Pl.'s 56.1 Stmt. ¶¶ 62, 63.) Plaintiff believes that "even if the plant run[s] out of a particular raw material . . . the plant can still operate, as the work will just be directed to another material." (Pl.'s 56.1 Stmt. ¶ 64.)

Defendant maintains that Plaintiff was responsible for the shortage of Zinc Oxide. (Def.'s 56.1 Stmt. ¶ 61.) Plaintiff states that the shortage was not his fault, but the fault of the "SAP" system, through which he ordered the material. Plaintiff alleges that "the SAP system failed to automatically submit the order to the vendor as it was supposed to." (Pl.'s 56.1 Stmt. ¶ 61.) During that incident, on October 3, 2004, Mr. Mackey sent an email to Plaintiff urging that "[i]t is critical we get our hands on this situation. We need to work through this Zinc Oxide crisis and ensure there are no other ones on the way. I am counting on you to right the ship. If you need a hand . . . don't hesitate to ask me or anyone else." (McQuade Decl. Ex. 1, at Ex. 20.) In response, Plaintiff wrote, "Thank you and I am on board to rectify the situation. Very tough lesson, but nonetheless...I have learned. I appreciate the support and I will not hesitate to ask." (McQuade Decl. Ex. 1, at Ex. 20.) When asked at his deposition whether he felt that he was "unfairly singled out in any way as a result of this [Zinc Oxide] incident," Plaintiff stated, "[I]t

was my responsibility, I didn't get the confirmation. So I accepted the responsibility, it was an error." (McQuade Decl. Ex. 1, at 154.) Plaintiff maintains, however, that he "does not admit that he alone was responsible for the shortage of the Zinc Oxide." (Pl.'s 56.1 Stmt. ¶ 65.)

At Plaintiff's 2004 annual performance review, he received an overall rating of 3, or "on target" from his supervisor Howard Mackey (Def.'s 56.1 Stmt. ¶ 66), which Plaintiff admits is "an average rating" (Pl.'s 56.1 Stmt. ¶ 68). The review included mention of the DiTab and Zinc Oxide incidents. (McQuade Decl. Ex. 1, at Ex. 16.) Mr. Mackey also received an overall performance rating of 3 that year, down from a rating of 4 for 2003, in part because of the Zinc Oxide crisis. (Def.'s 56.1 Stmt. ¶ 67; Mackey Decl. ¶ 15.) Plaintiff testified at his deposition that he felt his performance review was unfair because although the DiTab and Zinc Oxide incidents were "a critical issue, . . . outside of that [he had] never heard anything about [his] performance." (McQuade Decl. Ex. 1, at 155.) Plaintiff submitted a written rebuttal to the performance review, in which he disputed that the plant ever experienced a shutdown of production. (*See* McQuade Decl. Ex. 1, at Ex. 17.) Rather, Plaintiff claimed that "[a] majority of those [alleged production shutdowns] were not shutdowns just interruptions due to availability of materials." (McQuade Decl. Ex. 1, at Ex. 17, p. 31.) Plaintiff "believes he was given a lower review based upon his race, and that more opportunities were given to the non-minority employees." (Pl.'s 56.1 Stmt. ¶ 72.)

Plaintiff spoke to Joanne Rose, an associate director of human resources, about his review and Ms. Rose told him that the rating was "not bad and to keep plugging away." (Pl.'s 56.1 Stmt. ¶ 72.) In February 2005, Plaintiff met with Joseph Vitanza, a Managing Director, to discuss his performance review. Plaintiff told Mr. Vitanza that he had been expecting a

minimum rating of at least a 4.  Mr. Vitanza told Plaintiff "that he should not be discouraged by his rating, that he had a bright future with Wyeth, and that he needed to stay focused."  (Vitanza Decl. ¶ 3.)

On January 1, 2005, Plaintiff received an annual salary increase of 3.8% to $63,356.  On July 1, 2005, Plaintiff received another salary increase, of 3.5%, which brought his salary to $65,573.  (Def.'s 56.1 Stmt. ¶¶ 74, 75.)

There were four other Senior Material Schedulers at Wyeth around the time Plaintiff worked as a Senior Material Scheduler: Pasqua Castricato, Lynn Edsall, Anne Menchini, and Susan Bender.  Plaintiff "admits that each of the other Senior Material Schedulers had different responsibilities" than he did, but alleges that "his position was known to be the most difficult as he was supplying raw materials to all of [the] other material schedulers."  (Pl.'s 56.1 Stmt. ¶ 76.)

Ms. Castricato was hired by Wyeth in 1982 and became an Senior Material Scheduler in January 2004 with a starting salary of $62,617, after first having worked as an Associate Material Scheduler for over two years and a Material Scheduler for four years and in other positions.  (Def.'s 56.1 Stmt. ¶ 78.)  Defendant states that Ms. Castricato had a higher starting salary as a Senior Material Scheduler than Plaintiff due to a variety of factors, including her 22-year tenure at Wyeth and her nearly seven years of experience performing material scheduler responsibilities.  (Def.'s 56.1 Stmt. ¶ 79.)  Plaintiff believes she should not have had a higher starting salary than he did because, unlike Plaintiff, she had no management or supervisory experience and she did not have a Bachelors or Master's Degree.  (Pl.'s 56.1 Stmt. ¶ 79.)  Ms. Castricato received an overall performance rating of 3 from her supervisor Andrew Espejo on her 2004 performance review, which was the same as Plaintiff received.  In January 2005, she

received a 3.5% salary increase, less than Plaintiff's 3.8% increase, and in July 2005, she received a 1.5% salary increase, less than Plaintiff's 3.5% increase. (Def.'s 56.1 Stmt. ¶¶ 82, 83.) After the July 2005 salary increase, Ms. Castricato's salary was $65,782, which was $209 higher than Plaintiff's salary at that time, $65,573. (*See* Rose Decl. Ex. 10.)

Ms. Edsall began working for Wyeth in 1982, eventually becoming an Associate Material Scheduler in 1996, a Material Scheduler in August 1997, and a Senior Material Scheduler in January 2002. When she was promoted to Senior Material Scheduler, her salary was $76,049. (Def.'s 56.1 Stmt. ¶ 84.) Defendant maintains that Ms. Edsall's salary was higher than Plaintiff's because of a variety of factors, including her 22-year tenure at Wyeth, her seven years of experience as an Associate Material Scheduler, Material Scheduler, and Senior Material Scheduler, and her performance. Plaintiff disputes these reasons and points out that, unlike Plaintiff, Ms. Edsall had no prior supervisory experience and she had only a high school diploma. (Pl.'s 56.1 Stmt. ¶ 85.) As a Senior Material Scheduler, Ms. Edsall received an overall rating of 4 in each of her 2002, 2003, 2004, and 2005 performance reviews. (Def.'s 56.1 Stmt. ¶ 86.) Ms. Edsall received a 4.5% salary increase in January 2005, which was greater than Plaintiff's 3.8% salary increase, but Ms. Edsall received no other salary increases in 2005, whereas Plaintiff received an additional 3.5% increase in July 2005. Ms. Edsall's salary as a Senior Material Scheduler was at all times greater than Plaintiff's salary. (Rose Decl. Ex. 14.)

Ms. Menchini began working at Wyeth in April 1977. She worked in a number of positions before becoming a Material Scheduler from 1996 to 2001. She was promoted to Senior Material Scheduler in February 2001 at a salary of $66,753 and worked in that position until September 2001 and again from January 2004 through July 2005. (Def.'s 56.1 Stmt. ¶ 88.) Ms.

Menchini's starting salary as a Senior Material Scheduler was $66,753. In September 2001, Ms. Menchini was promoted to the position of Manager of Production Planning and given a corresponding salary and grade level increase. As a Manager of Production Planning, she supervised Material Schedulers and Senior Material Schedulers. From October 2002 through January 1, 2004, Ms. Menchini was a Project Manager and received additional salary increases. She finally returned to the position of Senior Material Scheduler in January 2004 after her Project Manager position was eliminated. This move was a demotion for Ms. Menchini from Grade 12 to Grade 10, but she was permitted to retain the salary level from her prior position, $83,579. (Def.'s 56.1. Stmt. ¶¶ 90-93.) At that time, Plaintiff's salary as a new Senior Material Scheduler was $61,037. Ms. Menchini received a 2.5% salary increase in January 2005, which was less than Plaintiff's 3.5% salary increase, but continued to make more than Plaintiff. Ms. Menchini received an overall rating of 4 on her 2004 year end review and an overall rating of 3 on her 2005 review. (Def.'s 56.1 Stmt. ¶ 94.) Defendant alleges that Ms. Menchini's starting salary in 2004 as a Senior Material Scheduler was higher than Plaintiff's because, among other factors, she had been at Wyeth over 27 years, she had previously held the positions of Associate Material Scheduler, Material Scheduler, and Senior Material Scheduler, and her salary was a cumulative result of a number of salary increases over her 27 years at Wyeth. Plaintiff disputes that these are the actual reasons she was paid more as a Senior Material Scheduler in 2004, and claims he had approximately seven years of supervisory experience when he became a Senior Material Scheduler, including a position as a Resident Director at SUNY Oswego and positions held while a student, and that he had Bachelors and Master's degrees, while Ms. Menchini only had an Associate's degree. (Pl.'s 56.1 Stmt. ¶ 95.)

Ms. Bender began working for Wyeth in 1985.  She became a Material Scheduler in July 2003 and a Senior Material Scheduler in January 2004, with a salary of $57,410.  Plaintiff acknowledges that Ms. Bender, whose salary as a Senior Material Scheduler rose to a high of $63,193 in July 2005, was never paid more than he was.  (Pl.'s 56.1 Stmt. ¶ 98.)  He maintains that their salary difference, $3610 in January 2004, $2004 in January 2005, and $2380 in July 2005, was "minute" and objects that their compensation was similar despite that he had "more supervisory experience, greater educational credentials and similar performance reviews as Bender."  (Pl.'s 56.1 Stmt. ¶ 98.)  Ms. Bender received a performance rating of 4 for the years 2001 through 2003 and 2005, and received a rating of 3 for 2004.  (Def.'s 56.1 Stmt. ¶ 97.)

In May 2005, Wyeth decided to form a special Compliance Implementation Team to work on compliance and quality assurance issues.  The individuals on the team would report to Maura Corcoran, then the Director of Audits.  (Def.'s 56.1 Stmt. ¶ 102.)  Plaintiff expressed an interest in the Associate Director Project Management Position and emailed Ms. Corcoran his resume.  (Pl.'s 56.1 Stmt. ¶ 103.)  He later followed up with another email asking to meet with her.  Plaintiff believes Ms. Corcoran failed to respond to any of his emails "because [she] had already hand selected the (white) individuals she wanted for the available positions."  (Pl.'s 56.1 Stmt. ¶ 103.)

Ms. Corcoran met with a group of managers, including Plaintiff's supervisor Ingrid Gibson, to discuss whom to interview.  (Def.'s 56.1 Stmt. ¶ 105.)  Ms. Corcoran was looking for individuals who had extensive project management and leadership skills and who were highly motivated, assertive, and aggressive.  (Def.'s 56.1 Stmt. ¶ 104.)  Plaintiff concedes that Ms. Gibson had previously described Plaintiff as having "a very laid back and mellow personality,

which may have resulted in the lack of an interview." (Pl.'s 56.1 Stmt. ¶ 104.) Defendants state that there were not many managers in the meeting who knew Plaintiff, so Ms. Gibson's comments about Plaintiff's laid back personality "may have eliminated [Plaintiff] from consideration for being selected for an interview, because Corcoran and the remainder of the group were looking for an individual who was very aggressive and assertive." (Def.'s 56.1 Stmt. ¶ 105.) Plaintiff was not chosen for an interview. According to Defendant, Michael Curry was selected unanimously for the position because of a variety of factors, including his over ten years of experience in the pharmaceutical industry, his experience in various management positions at Wyeth and elsewhere, and his Bachelor of Science in Biology and Master's Degree in Microbiology. (Def.'s 56.1 Stmt. ¶ 106.) Plaintiff believes he possessed all the requisite skills needed and that Mr. Curry was not the best candidate for the position. (Pl.'s 56.1 Stmt. ¶ 104.)

In July 2005, Defendant reorganized its Consumer Health Division, resulting in the creation of a Production Manager position, a Manager Production position, and a Packaging Manager position. (Def.'s 56.1 Stmt. ¶ 108.) Plaintiff informed Kevin Costello, a manager, that he was interested in the managerial positions (Pl.'s 56.1 Stmt. ¶ 108), but he was not promoted to any of the positions.

Defendant claims that Chris DeFeciani was chosen for the position of Production Manager because of his leadership and managerial capabilities, his experience, and his prior performance ratings. (Def.'s 56.1 Stmt. ¶ 109.) Plaintiff disputes the credibility of this statement, as he believes he "was qualified for this position, . . . [but] was not interview[ed], nor considered for the position." (Pl.'s 56.1 Stmt. ¶ 109.) Defendant claims that Jennifer Hallock was chosen for the position of Manager Production because of her work experience and prior

performance in a similar position of Supervisor of Production.  (Def.'s 56.1 Stmt. ¶ 110.)

Plaintiff believes that Ms. Hallock was not the best candidate for the job, as she was not as senior

as Plaintiff and as Plaintiff had previously been a Production Supervisor and held additional

supervisory roles at Wyeth.  (Pl.'s 56.1 Stmt. ¶ 110.)  Defendant maintains that it hired Francis

McDermott to fill the position of Packaging Manager because he had been performing well in a

similar position, Manager of Packaging Support.  (Def.'s 56.1 Stmt. ¶ 111.)  Plaintiff believes

that he was qualified to fill this position and that Mr. McDermott "had been pre-selected to fill

this position" even though Mr. McDermott "failed to attain the degree required for this position."

(Pl.'s 56.1 Stmt. ¶ 111.)  Defendant states that a college degree was not a requirement for this

position.  (Def.'s Reply to Pl.'s 56.1 Stmt. 59.)

     In 2005, there was another opening for a Production Manager.  Plaintiff expressed an

interest in the position to Kevin Costello, who was responsible for hiring for the position.

(Morelli Decl. Ex. 1, at 191; Costello Decl. ¶ 2.)  Mr. Costello was looking for an individual who

had, among other qualifications, seven to nine years of manufacturing-related experience and

three years of supervisory experience.  (Def.'s 56.1 Stmt. ¶ 112.)  Defendant maintains that

Daniel Ferry was selected for the position because he had approximately six years of experience

working in managerial and supervisory positions in a regulated manufacturing environment at

Solgar Vitamin and Herb.  Mr. Ferry had also worked as an Operations Manager at Health Tech

Inc., a regulated manufacturing environment, for approximately seven years.  (Def.'s 56.1 Stmt.

¶ 114.)  Defendant also maintains that Plaintiff was ineligible for the position because it would

have involved a three-level salary grade increase.  (Def.'s 56.1 Stmt. ¶ 116.)  Plaintiff disputes

that Mr. Ferry was the best candidate for the position.  Plaintiff points out that he had five years

of manufacturing-related experience, approximately seven years of supervisory experience, and his Master's Degree.  Plaintiff states that "[w]hile Ferry may have had slightly more manufacturing experience he did not know the 'in[s] and out[s]' of Wyeth like [Plaintiff] did." (Pl.'s 56.1 Stmt. ¶ 114.)

At this point, Plaintiff "considered the work conditions [at Wyeth] intolerable," and continued to work there only until he found other employment in September 2005.  He left Wyeth on September 27, 2005, to work for Par Pharmaceutical.  (Def.'s 56.1 Stmt. ¶ 120; Pl.'s 56.1 Stmt. ¶ 122.)

Plaintiff commenced this suit in January 2007 alleging race discrimination under 42 U.S.C. § 1981 and New York State Human Rights Law ("NYHRL"), specifically N.Y. Exec. Law § 296.  (Pl.'s Br. 1.)  In his complaint, Plaintiff alleged that while he was employed at Wyeth, as a result of his race (1) he received unequal pay compared to white employees when he was worked in compliance from February 2002 through January 2004 and when he was Senior Material Scheduler from January 2004 through September 2005; (2) Defendant hired other, white employees in 2005 for the position of Associate Director, Project Manager, for three newly created managerial positions, and for a Production Manager position; and (3) he received a performance review rating of 3 or "satisfactory," instead of 4 or 5, in 2004.  In his opposition to this motion for summary judgment, Plaintiff alleged that Defendant had subjected him to a hostile work environment.  Finally, Plaintiff also may have claimed constructive discharge in his complaint when he stated that he "terminated his employment . . . because his complaints had not been addressed and he realized that there was a lack of advancement opportunities for black employees."  (Compl. ¶ 35.)

In this motion for summary judgment, Defendant argues that Plaintiff's disparate pay claims should be dismissed because they are barred in part by the statute of limitations and because Plaintiff cannot prove that the comparison employees were similarly situated or that any disparate pay was the result of intentional discrimination. Defendant argues that Plaintiff's claims that Defendant failed to promote him must be dismissed because Plaintiff cannot prove intentional racial discrimination. Defendant argues that Plaintiff's claims based on his 2004 performance review should be dismissed because he cannot prove that he was rated 3 instead of 4 or 5 because of his race. Defendant argues that any claim of a hostile work environment should be dismissed because Plaintiff has not alleged facts "sufficiently severe or pervasive to alter the conditions of his work environment." (Def.'s Reply Br. 9.) Finally, "to the extent [Plaintiff] is attempting to assert a claim for constructive discharge," Defendant argues that Plaintiff cannot meet his burden of proof. (Def.'s Br. 2.)

## Discussion

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating the record to determine whether there is a genuine issue as to any material fact, "the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

To establish a prima facie case for racial discrimination under 42 U.S.C. § 1981 and under NYHRL, plaintiff must show "that 1) [he] is a member of a protected class; 2) [he] was qualified for [the] position; 3) [he] suffered an adverse employment action; and 4) the action

occurred under circumstances giving rise to an inference of discrimination." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999); *see also Lizardo v. Denny's, Inc.*, 270 F.3d 94, 103 (2d Cir.2001) (applying this framework to a § 1981 claim); *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 n.1 (2d Cir. 1999) (applying this framework to a NYHRL claim). "The burden then . . . shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the [adverse action]." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Norville*, 196 F.3d at 95. "If the defendant proffers such a reason, the presumption of discrimination created by the prima facie case drops out of the analysis, and the defendant will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005) (internal quotation marks omitted). "The plaintiff must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Id.* (internal quotation marks omitted).

There is no dispute that Plaintiff, a black male of Haitian descent, is a member of a protected class.


*Plaintiff's Disparate Pay Claims*

Being paid less than similarly situated employees constitutes an adverse employment action. *See Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006). Plaintiff alleges that, when he was Compliance Coordinator from February 2002 to May 2003, a Senior Compliance Coordinator from April 2003 to January 2004, and a Senior Material Scheduler from January

2004 through September 2005, white counterparts "were given . . . higher starting salaries for the same position[s] despite having fewer qualifications and not possessing college degrees." (Compl. ¶¶ 14, 23; Pl.'s Br. 20.)

Defendant argues first that Plaintiff's claims relating to his Compliance Coordinator position are time barred. The statute of limitations for § 1981 claims is four years and for NYHRL claims is three years, *see Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004) (concluding that a four-year statute of limitations applies to all § 1981 claims); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998) ("[A] cause of action under New York's Human Rights Law is governed by a three-year statute of limitations."), and runs from the date the pay decision took effect, *see Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S. Ct. 2162, 2165 (2007). The pay decision for Plaintiff's Compliance Coordinator position took effect on February 1, 2002, the date Plaintiff assumed that title. Plaintiff initiated this action in New York State Supreme Court in January 9, 2007. Plaintiff acknowledges that "claims that fall after January 9, 2003 [for the § 1981 claims] and January 9, 2004 [for the NYHRL claims] are within the statute of limitations," but argues that "[t]he acts that occurred outside the limitations period are presented as part of a continuing violation for the hostile work environment claims, and as background information to establish a discriminatory intent." (Pl.'s Br. 20.) For the purposes of an employment discrimination claim based on unequal pay, each pay decision is a separate and discrete act. *See, e.g.*, *Ledbetter*, 127 S. Ct. at 2165 (noting that "a pay-setting decision is a 'discrete act'"). Therefore, Plaintiff's claims of disparate pay under § 1981 prior to January 9, 2003 and under NYHRL prior to January 9, 2004, are time-barred.

Plaintiff's remaining claims of disparate pay span from January 9, 2003 through September 2005 under § 1981 and from January 9, 2004 through September 2005 under NYHRL. "[T]o make out a prima facie case of unequal pay for equal work . . . plaintiff must show that (1) [he] is a member of a protected class; and (2) [he] was paid less than non-members of [his] class for work requiring substantially the same responsibility." *Belfi v. Prendergast,* 191 F.3d 129, 139 (2d Cir. 1999). The comparators need not be identically situated employees, but must be "similarly situated in all material respects." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001).

Plaintiff uses Derek Burt and Christopher DeFeciani as comparators for the Compliance Coordinator position, which Plaintiff held from February 2002 to May 2003, and the Senior Compliance Coordinator position, which Plaintiff held from May 2003 to January 2004. (Compl. ¶ 14.) Both Mr. Burt and Mr. DeFeciani were GMP Compliance Specialists, not Compliance Coordinators, before becoming Senior Compliance Coordinators. Mr. Burt was a Senior Compliance Coordinator from December 2001 to May 2003. Mr. DeFeciani was a Senior Compliance Coordinator from December 2001 to August 2002. Plaintiff never worked as a Senior Compliance Coordinator at the same time as either Mr. Burt or Mr. DeFeciani. Each had worked at Wyeth longer than Plaintiff, Mr. Burt since November 1999 and Mr. DeFeciani since 1987. They also each had better overall performance ratings than Plaintiff for the years 2001, 2002 and 2003. Plaintiff thus cannot demonstrate that he was paid less than any similarly situated employee who is not a member of Plaintiff's protected class.

For Plaintiff's claims of disparate pay while he was a Senior Material Scheduler, from January 2004 to September 2005, Plaintiff named four comparison employees, Pasqua

Castricato, Lynn Edsall, Anne Menchini, and Susan Bender. Ms. Castricato, Ms. Edsall, and Ms. Menchini had each been employed by Defendant for more than 15 years longer than Plaintiff and each had prior experience in the area of material scheduling. Thus, Plaintiff cannot demonstrate that they were materially similarly situated employees who were paid more than he was. Furthermore, Ms. Bender, who had worked at Wyeth since 1985 and who had prior experience in the area of material scheduling, was never paid more than Plaintiff. Plaintiff complained that the difference in their salaries was not large enough when he had "more supervisory experience, greater educational credentials and similar performance reviews." (Pl.'s 56.1 Stmt. ¶ 98.) Drawing all possible inferences in favor of Plaintiff, Plaintiff has not raised an issue of fact as to whether he was subjected to lower pay as a result of discrimination based on his race.

Therefore, summary judgment on Plaintiff's disparate pay claims is granted.

*Plaintiff's Failure to Promote Claims*

Failure to promote is an adverse employment action. Plaintiff alleges that Defendant discriminated against him by failing to promote Plaintiff on three occasions to the position of Associate Director, Project Management in May 2005, to three newly-created managerial positions in July 2005, and to a Production Manager position also in 2005.

In May 2005, Defendant "sought to fill the [Associate Director, Project Management] position with an individual who was very assertive, had extensive management skills, strong leadership skills, skills in investigations, and skills in quality assurance." (Pl.'s Br. 4.) Plaintiff acknowledges that his supervisor, Ingrid Gibson, a black female manager who was present a

meeting to decide whom to interview for the position, believed Plaintiff had "a very laid back and mellow personality." (Pl.'s 56.1 Stmt. ¶ 104.) Defendant states that Michael Curry was ultimately selected for the position because of a variety of factors, including his over ten years of experience in the pharmaceutical industry, his experience in various management positions at Wyeth and elsewhere, and his Bachelor of Science in Biology and Master's Degree in Microbiology. (Def.'s 56.1 Stmt. ¶ 106.) Plaintiff had worked in the pharmaceutical industry for half as long and had degrees in business administration rather than biology. Even if this Court assumes that Plaintiff, as he alleges, possessed the assertiveness, leadership, and management skills that Defendant sought for the position, Mr. Curry's background and degrees were legitimate, nondiscriminatory reasons for promoting him. Plaintiff has not presented any evidence that these reasons were a pretext for discrimination.

Similarly, the employees Defendant promoted to the three managerial positions created in July 2005 were amply qualified for their positions. Chris DeFeciani, Jennifer Hallock, and Francis McDermott each had prior experience in similar positions and strong performance ratings. Even assuming Defendant's failure to promote Plaintiff to any of these positions gave rise to an inference of discrimination, Defendant has proffered legitimate, nondiscriminatory reasons for its decisions. Plaintiff has produced no evidence of pretext in rebuttal.

Finally, to fill the Production Manager position opening in 2005, Defendant sought an individual with seven to nine years of manufacturing-related experience and three years of supervisory experience. As of 2005, Plaintiff had only five years of post-education work experience and the Production Manager position was three levels above the salary grade at which Plaintiff was then working. Defendant hired Daniel Ferry from outside Wyeth to fill the

position. Mr. Ferry had approximately thirteen years of experience working in managerial and supervisory positions in a manufacturing environments at Solgar Vitamin and Herb and Health Tech Inc. These are legitimate, nondiscriminatory reasons for hiring him for the position. Even assuming that Plaintiff was qualified for the position, as he argues he was, he has produced no evidence to indicate that Defendant's reasons for hiring Mr. Ferry were a pretext for discrimination.

Thus, summary judgment on Plaintiff's failure to promote claims is granted.


*Plaintiff's Claim of Discrimination Based on His 2004 Performance Ratings*

Being given lower performance ratings can constitute an adverse employment action. *See Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) ("[A]ctions such as negative employment evaluation letters may also be considered adverse.") Plaintiff did not allege in his complaint that he was given lower performance ratings because of discrimination, but he subsequently stated that he "believes he was given a lower review [for the 2004 work year] based upon his race." (Pl.'s 56.1 Stmt. ¶ 72.) Plaintiff received an overall rating of 3, or "on target" for the year 2004. (Def.'s 56.1 Stmt. ¶ 66.) That year, shortages of DiTab and Zinc Oxide, two materials which Plaintiff was responsible for procuring, had led to, in Plaintiff's words, "interruptions [in production] due to availability of materials." (McQuade Decl. Ex. 1, at Ex. 17, at 31.) Plaintiff admitted that the DiTab and Zinc Oxide incidents were "a critical issue" (McQuade Decl. Ex. 1, at 155) and that 3 was "an average rating." (Pl.'s 56.1 Stmt. ¶ 68.) Plaintiff had previously received a rating of 3 for the years 2000 and 2001 and Plaintiff testified at his deposition that he did not feel that he was discriminated against on the basis of his race at

any time prior to February 2002, which would include when he received his 2000 and 2001 performance evaluations.  (McQuade Decl., Ex. 1, at 54:17-21; Def.'s 56.1 Stmt ¶¶ 13, 15.)  A 2004 performance rating of 3 in this context does not seem to constitute an adverse employment action as required to establish a prima facie case of employment discrimination.

Even assuming Plaintiff had established a prima facie case of employment discrimination, Defendant proffered a legitimate, nondiscriminatory reason for the action: Plaintiff's failure to procure two raw materials, which led to, at the very least, "interruptions due to availability of materials."  (McQuade Decl. Ex. 1, at Ex. 17, at 31; Def.'s 56.1 Stmt. ¶ 66.)  Plaintiff's supervisor's rating was also affected by the Zinc Oxide incident; he received an overall rating of 3 for the year 2004.  (Def.'s 56.1 Stmt. ¶ 67; Mackey Decl. ¶ 15.)  Plaintiff has not presented any evidence that Defendant's reason for giving him a rating of 3 was merely a pretext for discrimination.

Summary judgment on Plaintiff's discrimination claims based on his performance ratings are thus granted.

*Plaintiff's Hostile Work Environment Claim*

Plaintiff also alleges, for the first time in his memorandum of law in opposition to this motion, that he was subjected to a hostile work environment in violation of 42 U.S.C. § 1981. "To withstand summary judgment [on a hostile work environment claim], a plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working

environment." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (internal quotation omitted).

Plaintiff's sole basis for his hostile work environment claim is Joseph Vitanza's use of the term "tar baby" at a February 12, 2005 meeting of approximately one hundred Wyeth employees to refer to an unidentified problem with a maintenance system.  (Pl.'s Br. 19; Morelli Decl., Ex. 13, at 9.)  Mr. Vitanza, a Managing Director of Wyeth's Pearl River facility, testified that he did not ascribe any "racial connotation" to the term and that "in Webster's dictionary . . . tar baby does not have a racial connotation," but refers to "[a] situation which one has a hard time extricating themselves from."  (Morelli Decl., Ex. 13, at 10.)  Two African-American Wyeth employees, Jeff Gathers and Martha Cozart, spoke with Mr. Vitanza about the remark, but Mr. Vitanza believes they were satisfied with his explanation.  (Morelli Decl., Ex. 13, at 11-12.)  Mr. Vitanza told Ms. Cozart that "if anyone else had similar concerns, . . . [he] would be more than happy to speak to them."  (Morelli Decl., Ex. 13, at 10.)  Plaintiff states that the term "tar baby" is synonymous with the term "nigger" and it historically and commonly has had "negative aspects revolving around pejorative images of African Americans."  (Pl.'s Br. 19.)  Plaintiff alleges that Mr. Vitanza's use of the term "interfered with [his] ability to perform his job."  (Pl.'s Br. 19.)

This Court acknowledges that the term "tar baby," which appears to have originated in the late nineteenth century in the story "Bre'r Rabbit and the Tar Baby," part of the "Uncle Remus" stories written by Joel Chandler Harris, has come to assume negative racial connotations in modern culture and that its use can be considered a racial epithet.  Mindful of the possibility that a single, extraordinarily severe incident may alter an employee's work conditions

sufficiently to give rise to a hostile work environment claim, this Court nonetheless concludes as a matter of law that no jury could reasonably find that Mr. Vitanza's one-time use of the term "tar baby" in the context was so "extraordinarily severe" as to create a hostile work environment for Plaintiff.

Summary judgment is therefore granted on Plaintiff's hostile work environment claims.

*Plaintiff's Constructive Discharge Claim*

In his complaint, Plaintiff seems to have claimed constructive discharge based on his allegations that he "terminated his employment with Wyeth . . . specifically because his complaints had not been addressed and he realized that there was a lack of advancement opportunities for black employees to be promoted to positions of upper management." (Compl. ¶ 35.) "Constructive discharge occurs 'when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Morris v. Schroder Capital Management Int'l*, 481 F.3d 86, 88 (2d Cir. 2007) (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir.1983)). The standard is objective: the employee must show that "a reasonable person in the employee's position would have felt compelled to resign." *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 608 n.9 (2d Cir. 2006).

In opposition to Defendant's motion, Plaintiff states that he "was forced to accept a significant[ly] lower pay than his counterparts . . . despite his qualifications and degrees." (Pl.'s Br. 24.) Plaintiff also alleges that he has "been subjected to racially offensive remarks which evidence[] the discriminatory animus which permeates Wyeth." (Pl.'s Br. 24.) Plaintiff has not

produced enough evidence for a reasonable juror to find that he was forced to accept lower pay than his counterparts and the evidence indicates that Plaintiff's salary increased regularly from the time he began working at Wyeth in 2000 to September 2005 when he left the company. Furthermore, this Court concludes that the single racially offensive remark that Plaintiff alleges, Mr. Vitanza's February 2005 use of the term "tar baby," is insufficient to make Plaintiff's "working conditions so intolerable that [he was] forced into an involuntary resignation."  Finally, this Court notes that even if these allegations were true, they took place months and in some cases years before Plaintiff left Wyeth.  The conditions thus could not have been so intolerable as to rise to the level of constructive discharge.

Summary judgment on Plaintiff's constructive discharge claim is granted.

## Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is granted and this action is dismissed with prejudice.  The Clerk of Court shall terminate all motions pending as of February 28, 2008 as moot and close the case.

SO ORDERED.

Dated: White Plains, New York
      February 28, 2008

*Charles Brieant*

Charles L. Brieant, U.S.D.J.